# AFFIDAVIT

I, Richard C. Bernecker, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

1.   I am a TFO with DEA in the Cincinnati Resident Office (RO) and have been since August 2012. Prior to my assignment as a Task Force Officer, I was a Patrolman and Detective at the Colerain Police Department. I have been employed as a police officer for eighteen (18) years. As a Task Force Officer with the DEA, my duties have included the investigations of violations of federal laws concerning the importation, manufacture, possession, and distribution of controlled substances as defined by Title 21, United Stated Code, including controlled substances such as heroin, cocaine, methamphetamine, and other dangerous drugs. During my tenure as a police officer, I have participated in numerous investigations involving drug trafficking and have attended numerous specialized training schools conducted by the DEA and other law enforcement agencies. Some of the training I have attended includes: DEA Basic Investigators School, Operation Jet-way Training (training that is specialized to airplane, train, and bus interdiction), Interdiction Training, and many more. I have participated in all aspects of drug investigations, including physical surveillance, undercover operations, execution of search warrants, interdictions, and arrests of drug traffickers.

2.   This Affidavit sets forth the factual basis for the civil forfeiture of certain seized property and is based on my personal investigation. It does not include all information obtained during this investigation, rather only that believed necessary to provide a legal basis for the civil forfeiture.

3. On October 7, 2022, agents from the DEA Cincinnati RO received information on an anonymous tip line that Nathaniel Thomas Hatcher, III, and Yaquasia Arianna Delcarmen were booked on a Delta Airlines flight from Cincinnati that day on a suspicious flight itinerary. They were traveling to Sacramento, California, a known source city/state, with a connecting flight in Salt Lake City, Utah, by way of one-way tickets that were purchased one (1) day prior to their travel. I have learned through training and experience that drug traffickers and their couriers often fly on one-way tickets and usually do not make travel plans much in advance because they get last second information that the narcotics are ready or instructions and they have no idea how long the transaction will take. DEA previously had been advised by local law enforcement that Hatcher was a known drug trafficker taking flights out of the airport, and Hatcher had a drug-related criminal history.

4. I responded to the departure gate accompanied by TFO Nicholas Nimeskern and Airport Police Department (APD) Officer Norman Robert Minter to await the departure of the flight to Salt Lake City. Officer Minter positioned himself behind the counter and watched as tickets were scanned waiting for Hatcher and Delcarmen to present their tickets so that officers could attempt to speak with them. TFO Nimeskern and I noticed a couple walk away from the gate area after seeing agents at the gate. TFO Nimeskern called airport police dispatch and asked the dispatcher to follow the couple on camera to see where they went. TFO Eli Sautter responded to dispatch to assist with surveillance on the couple.

5. TFO Nimeskern, Officer Minter, and I worked the entire boarding for the Salt Lake City flight, but Hatcher and Delcarmen never boarded. The gate agent advised that Hatcher and Delcarmen had removed themselves from the flight to Salt Lake City and rebooked a to Atlanta. TFO Sautter advised that the couple he was surveilling had gone to a different gate and that he had observed the male give the female large stacks of U.S. currency and conceal a large stack of U.S. currency on his person.

6. TFO Nimeskern and I traveled to where the male and female were located, TFO Nimeskern observed the female sitting near the gate holding a large stack of cash. The male was seated in the same gate area about thirty feet away from the female. When TFO Nimeskern approached the female in the open waiting area, he observed her attempting to hide the cash behind her back. TFO Nimeskern identified himself as a TFO with DEA, showed his badge, and asked the female if she was Yaquasia Arianna Delcarmen. She answered affirmatively and, when questioned, indicated that she was willing to speak to TFO Nimeskern. Delcarmen was free to walk away at any time.

7. TFO Nimeskern explained to Delcarmen that he and the other officers were part of an interdiction team looking for weapons, narcotics, and large amounts of currency traveling through the airport. He asked Delcarmen if she had any of those things on her person or in her luggage, and Delcarmen stated, "just money." TFO Nimeskern asked Delcarmen if that was some of the money that she hid behind her back, and she indicated that it was. TFO Nimeskern then asked if she would show him her identification, and she produced a Florida driver's license verifying her identity.

3

8. TFO Nimeskern asked Delcarmen if the currency she was traveling with belonged to her, and she indicated that it was not and later stated that she had nothing to do with the money. When asked why she was attempting to hide the currency, Delcarmen stated that she was doing what Hatcher told her to do. Delcarmen consented to a search her carry-on bag, but indicated that they would not find anything there as they were carrying all the money on them. I conducted the search of Delcarmen's bag, which was located next to Hatcher, but did not find anything of relevance except for a cell phone. I asked Delcarmen for permission to search cell phone for any evidence of drug trafficking, and she consented but requested that a female officer search it. Deputy Christine Huebner later arrived and conducted a search of Delcarmen's person and cell phone, and no evidence was recovered from either search.

9. When asked, Delcarmen confirmed that the male she was traveling with that was seated thirty feet away was Hatcher, and I then approached him. I identified myself as a TFO with DEA, showed my badge, and, when questioned, Hatcher indicated thathe was willing to speak to me. Hatcher was free to walk away at any time.

10. I explained to Hatcher that the other officers and I were part of an interdiction team looking for weapons, narcotics, and large amounts of currency traveling through the airport. I asked if Hatcher had any of those things on his person or in his luggage, and Hatcher stated, "I don't have anything." I asked Hatcher if he would show me his identification, and he produced a Kentucky driver's license verifying his identity.

11. I questioned Hatcher about his purpose for travel, and he stated that he came to Kentucky a couple of days ago to see his son in the Lexington area. When I

advised Hatcher that he needed to be honest because agents know more about him than he knows and had been watching him on surveillance cameras (they had observed Hatcher remove his red bandanna from his head and hide it under the chairs in an attempt to change his appearance), he became animated, stood up, and pushed my chest. I advised Hatcher not to touch me, to calm down, and that agents already observed him and Delcarmen exchanging and concealing cash. Hatcher advised that all the money was his and that he did not want to deal with them, so he tried hiding it. Hatcher further advised that he flies out of Cincinnati frequently, knows who the agents are, and did not want them to find his money. I asked Hatcher if that is why he canceled his flight to Salt Lake City, and he stated, "exactly."

12. I advised Hatcher that I knew he had concealed a brick of currency inside his clothing and that we needed to retrieve the hidden cash. TFO Nimeskern then escorted him to a place where he could remove the cash privately. While walking with Hatcher, TFO Nimeskern asked him where the cash was hidden, and Hatcher indicated that it was in his underwear. TFO Nimeskern asked Hatcher for permission to retrieve the cash from his pants just in case there was any contraband, and Hatcher verbally consented to the search. Hatcher later consented to TFO Nimeskern retrieving cash that TFO Sautter saw him hide in his jacket sleeve as well. Hatcher also consented to a search his carry-on duffel bag. I searched Hatcher's bag and found multiple iPhones along with a folder with business paperwork for Four Tires Motor Sales LLC. The paperwork looked suspicious because it was blank where information should have been filled in. When I asked Hatcher what he did for employment, he stated that he worked for Four

5

Tires Motor Sales LLC and Global Trainers LLC. Hatcher refused to consent to a search of his cell phones for evidence of drug trafficking, and I advised Hatcher that his phones would be seized as evidence and that agents would apply for a search warrant for them.

13.  When I asked Hatcher about his travel to Cincinnati, he stated that they arrived Sunday and had flow on United Airlines. When I questioned whether using that airline was another attempt to avoid agents, Hatcher stated, "I have to keep you guys on your toes." I asked Hatcher why he was carrying so much cash, and he advised that he had been shut out of his bank account and needed to carry cash with him. He indicated that he was not sure if his account was locked for suspicious activity and, when asked if he had ever been in trouble, he just laughed and said, "Come on bro, you already know." Hatcher stated that he was on probation and that his probation officer was aware of his travel. In response to my question about his annual income, Hatcher stated that he was not sure how much he made each year, nor was he sure if he if he had filed tax returns although he stated that he had paid "some" taxes.

14.  In total, $34,000.00 in U.S. currency was retrieved and seized from Hatcher and Delcarmen. They were the only individuals present at the time of the searches and seizures other than law enforcement. When I advised Hatcher that we were seizing the currency, he stated that that he would get it back and that "I have got money back every time law enforcement has tried to take it." Hatcher and Delcarmen continued with their travels after the searches and seizures. Thereafter, the currency was examined by a drug-detecting dog, who showed a positive indication for a narcotic odor thereon.

15. Airport Police Department Detective Joe Moyer later applied for and obtained a state search warrant for Hatcher's three cell phones. The search of Hatcher's phones revealed photos of various types of marijuana, stacks of cash, a priority mail parcel, vacuum sealed packages, and a list of orders, as well as text messages indicative of drug trafficking.

16. Several factors established probable cause to believe that the currency seized from Hatcher and Delcarmen was proceeds of drug-related activity or intended for such use, including but not limited to the following:

   a. Their travel on recently purchased, one-way airline tickets to a known source city/state with large amounts of cash;

   b. Hatcher's drug-related criminal history;

   c. Their attempt to avoid detection by changing flights and leaving the original departure gate area;

   d. Photos and text messages on Hatcher's cell phones indicative of drug trafficking;

   e. Lack of any evidence or assertion of a legal source for the currency; and

   f. Positive alert by a drug-detecting dog on the seized currency.

17. DEA commenced administrative forfeiture proceedings against the $34,000.00 in U.S. currency. On or about January 4, 2023, Hatcher filed a claim to the currency in the administrative forfeiture proceeding, asserting that seized currency was given to him by his mother to be used to pay his mortgage, other bills, living expenses, and other costs because his personal bank account was frozen.

18. Based on the information provided in this Affidavit, affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, represents proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6).

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true. Further your affiant sayeth naught on this the 2 day of June, 2023.

Richard C. Bernecker, Task Force Officer
Drug Enforcement Administration